Ms. Harper? Yes, Your Honor. I'll hang up now. I think you're all done. Thank you, sir. Okay. Good morning, Your Honors. My name is James Lopes Hens. I represent the appellant, Darren Hutchinson. I'd like to reserve two minutes, if I could. The nub of this case is a decision in Raley v. Ohio, and the question is whether or not the Washington State Supreme Court's last decision in Mr. Hutchinson's case is clearly contrary to established Supreme Court precedent. And it is. It's contrary to Raley, it's contrary to Laub, it's contrary to Doyle v. Ohio, and it's contrary to Marks. In this case, the Washington Supreme Court focused on the phrase, active misleading, and held that, and looked only at that when, in fact, it is one of three alternative ways outlined in the Raley case in which due process can be violated when it comes to advising someone or not advising someone about their Fifth Amendment rights. Raley says that vague and undefined commands about the Fifth Amendment can give rise to a due process violation. Inexplicably contradictory commands can give rise to a due process violation. And active misleading can give rise to a due process violation. The State court concluded that Mr. Hutchinson could not show that it, the court in Hutchinson 1, had actively misled him into believing he was at liberty to refuse to answer incriminating questions. That is, their interpretation of Raley is simply wrong. They went to page 438 and cited the language on that page. So did the district court in this case. And the language on that page simply doesn't bear out the construction they put on it. If there were any doubt about that, it would have been completely dispelled by the subsequent decision in United States v. Laub where the court put the conjunction or between the first and second alternatives and then put the phrase and certainly not between the second and third alternatives. If Mr. Hutchinson showed that any one of those three ways of committing a due process violation occurred, then he's entitled to relief here. Everyone agrees that the Washington State Supreme Court's opinion in Hutchinson 1 was contradictory. The Washington Supreme Court agreed that it was contradictory. The district court in this habeas case agreed that it was conceitedly vague and contradictory. So Mr. Hutchinson should win because he was given at the very least contradictory advice as to whether or not he could refuse to answer incriminating questions. Raley's a tad different, though, isn't it? In Raley, he doesn't have a judicial officer, i.e., the trial judge, saying, wait a minute, here's how I interpret it, do it this way. So he doesn't have a state, neutral state officer telling him, well, it's messy, all right, and those guys don't know how to write and they don't know how to tell people what to do, but I'm telling you what it means. Well, that's true. I mean, there was a trial judge there. Different. I mean, he's not just some poor guy sitting in front of all these officers saying, this is okay, this is okay, this is okay. Right. And so he's trapped because he's got this different trial judge sitting there saying, it's not okay, here's how I read it. That's true. It's different. But he also has nine justices in Olympia that have told him, you have the right to not answer. Yeah, but we know that Olympians very often don't issue very straight answers. You know, like the Oracle at Delphi didn't necessarily say something that you could go out and bet your life on. Well, a lot of people did. That's true. And if the Oracle at Delphi gave a person ambiguous and confusing or conflicting advice as to whether or not they could take the Fifth and then you relied on the Oracle at Delphi and the Oracle at Delphi was a state actor, and they had a due process clause, you'd win. But suppose a high priestess then said, look, you know, we all know what the – you can't tell quite what the Oracle's saying, but let me tell you what the Oracle meant. Doesn't that – isn't that a decision? Well, that's fine, but the Washington Supreme Court is above the trial court. Everybody's guessing as to what the – So is the Oracle above the priestess. The Oracle is God speaking through the mouth of this person. And in your hypothetical, I think the person misadvised by the Oracle should win. Okay. But it's a little different from – It is a little different. Okay. Even the prosecutor in this case told the trial court that he couldn't understand what the Washington Supreme Court decision meant. He said it was a puzzle and he couldn't figure out exactly what does it mean. The habeas court in this case said it was ambiguous. And under that other alternative – The problem was the instructions given by the trial judge. Put aside the question about what the Supreme Court said in its order. The trial judge did interpret it and did give instructions to the – to your client. Do you quarrel with those instructions? Well, in retrospect, I cannot quarrel with the fact that the trial court turned out to be right in the sense that when he said, this is confusing, but this is what I think they mean, 10 years later, the Supreme Court said that is what we mean. So your client is told by the trial judge what – correctly now you say – what it is, how to interpret the Washington Supreme Court's cryptic statement. How is that different from any other situation where you've got confusing Ninth Circuit law or confusing Supreme Court law, and the trial judge looks at the cases and says, you know, I don't see that these cases are all that consistent, but here's what I think the law is, you know, and I'm instructing you, this is what the law is, and you're going to, for purposes of further proceedings in this case, the law is going to be what I tell you it is, which is the way it works in trial courts. In trial courts, you may disagree with the trial judge, you may say the trial judge has misread the latest Supreme Court opinion, but when the trial judge says this is what the law is, everybody says, yes, Your Honor, because, you know, you can appeal or whatever, but for the time being, that's the law. And if you're saying that the trial judge's interpretation was correct, turns out to have been correct, where is your beef? The interpretation that there wasn't a Fifth Amendment right turned out to be correct in Raley as well, Your Honor. It turned out nobody ultimately qualified with the fact that there was no Fifth Amendment right, but the person was given an assurance by, in that case, somebody who appeared to be acting for the State, was acting for the State, and appeared to know that at least two of the people were given express assurances that you can rely on the Fifth Amendment, even though they were wrong. One of the people, Mr. Brown, was told absolutely nothing, absolutely nothing at all about whether or not he had a Fifth Amendment privilege. He asserted it, and everyone sat there silently and didn't quarrel with him. And Mr. Brown's conviction was reversed in Raley because the Court said that commission gave the impression by its silence, by not quarreling with him, that he had the Fifth Amendment privilege. Did the trial court here leave any such impression? The trial court here said, this is what I think it means. And he said, now I'm going to impose some sanctions. That's the forum he's in. He's wanting to be in the forum facing those commissioners or whatever they were in Raley who said what they said and then said whatever they wanted to be said with a silence. But here you've got the guy running the proceedings. He's the guy in charge, and he says, this is what I think it means. But he's not – he's only in charge at that point, And you cannot deny the fact that what he is saying conflicts with a sentence in Hutchison 1 which says, you may refuse to answer incriminating questions. That is conflicting. Everyone agrees that's conflicting, so we win. So what? Well, see, you win. Because Raley says – If you follow the instructions you're given, arguably you win. In this case, somebody made the judgment, the trial court is wrong. I'm going to take my chances on appeal. And you may have an argument there, but I don't think it's Raley. But Raley, the commissioner, was wrong. But it was the commissioner who was speaking. In this case, it was the trial court who was speaking. That's who the defendant has the opportunity to listen to. Well, even when no one speaks, Mr. Brown wins his argument. I also wanted to point out that I think this is – If it's that messy, how can it meet the ADPA standard? Oh, it's mystic that the advice from the Washington Supreme Court could be characterized as mystic. But the advice from the holding of the United States Supreme Court is not mystic at all. No, no. I'm listening to questions you're being asked of different approaches to this. If that's the problem, then how can they be so wrong on a habeas? They're wrong because Judge Zille said, totally incorrectly, he said, confusing Mr. Brown and Mr. Stern, he said that the Raley opinion suggests that if you get ambiguous advice, you can't claim a Raley violation, which is just dead flat wrong. Now, Mr. Laub got conflicting advice from different press releases of the State Department. One came at one time saying, no problem going to Cuba, and another came at another time. I also – I'm running out of time. I'm out of time. So what I will do, if I may, is just make one last point about who the court is speaking – who gets this advice, this crazy, conflicting advice? It's a man who is a paranoid schizophrenic with dyslexia, attention deficit disorder, and borderline mental retardation, who was told by his attorney, yeah, the Supreme Court said you don't have to answer anything incriminating. And his attorney also knew, not Mr. Hutchinson, but his attorney knew that if you don't assert the privilege, you waive it. What could a person in Mr. Hutchinson's position be expected to do? Thank you. Okay. We'll hear from the government. Good morning. May it please the Court. My name is Paul Weiser, and I'm an assistant attorney general representing Apelli Morgan in this matter. The district court's decision to deny habeas corpus relief should be affirmed in all respects. It's our position that Mr. Hutchinson is not entitled to relief under the Anti-Terrorism and Effective Death Penalty Act of 1996. The Washington Supreme Court's decision regarding the Rayleigh claim was correct. The Rayleigh Doctrine does not, in fact, apply under the facts of Mr. Hutchinson's case. You know, what's troubling in this case is that it's something that the dissent in Washington Supreme Court picked up when it said, you know, we really fouled this thing up. The proper and honorable thing to do would be to grant his writ here and now. Because what he really did say to them on examination, you can refuse to answer any question. Yes, Your Honor. He really told them that. That was the opinion or those were the views of two members of the Washington Supreme Court. Well, I'm talking about what it – all I'm saying is that it does sound like it would have been the proper and honorable thing to do. The rest of it is not tracking that. It is, in fact, the case that they did say that he could just no ifs, ands, or buts, just plain out refuse to answer any question. Yes, Your Honor. But I think that it has to be put into context where it was that that occurred. That immediately preceded the actual holding of the court where the court signaled to the world, we hold the following. They addressed the questions that were being raised on that appeal, that interlocutory appeal, one of which was Mr. Hutchinson has to submit to a mental examination by the State's expert, no ifs, ands, or buts. His counsel can be present but can't interfere, and the trial court is responsible for policing any – Well, the problem is it makes no sense. I mean, and everybody who looks at it has to say it makes no sense. You can't say in one paragraph you may refuse to answer a question, and the next paragraph say, oh, well, you have to answer the question and the trial judge will protect you. Those are vastly different concepts. Are they not? That's certainly arguably, Your Honor, and there was that ambiguity in the court's decision. I think, however, the trial judge got it right when he said that this is the way we're going to proceed, this is what's going to happen here, and this was just shortly following the Washington Supreme Court's decision being issued on January 13th, 1989. The judge laid down the law and said this is how we're going to proceed. You will, in fact, submit to an examination by Dr. Muscatel. I, the trial judge, will, through in-camera review or through exclusion of testimony bearing on the incriminating statements that may come out, I will police up the Fifth Amendment issues here, assuming that this evidence is presented at trial because the waiver, I guess there's the question, when does the waiver actually occur of Fifth Amendment privilege? Does it happen at the time of the interview or does it happen at the time when the defendant actually asserts the diminished capacity defense at trial and, in fact, submits the evidence of the defense experts? But that was the trial judge's instruction to the parties that that was how the case was going to proceed from that point. So any ambiguity that there may have been in the court's decision, the judge clarified shortly thereafter by instructing the parties how it would be proceeding. And Mr. Hutchinson had fair warning here exactly what was going to happen. The trial court clearly put Mr. Hutchinson on notice of the consequences of failing to In Raleigh, Raleigh v. Ohio, the witnesses didn't receive any fair warning. In fact, that was part of the Supreme Court's decision in Raleigh, a state may not issue commands to its citizens under criminal sanctions in language so vague and undefined as to afford no fair warning of what conduct might transgress them. Here Mr. Hutchinson did in fact have fair warning. He was put on notice that his experts would be excluded if he didn't submit to an examination by the state's expert. And he got that from two separate actors, from the Washington Supreme Court and also from the trial court on remand from the Washington Supreme Court. And it's also important to remember that Mr. Hutchinson wasn't sanctioned for submitting or for asserting his Fifth Amendment privilege, as was the case in Raleigh. Mr. Hutchinson was sanctioned in the sense that his discovery sanction was imposed, but actually the criminal punishment he was facing was not for asserting the Fifth Amendment privilege. It was for the two charges of aggravated first-degree murder. And we believe that the decision of the Washington Supreme Court in this case is entitled to deference under 2254d-1, and that the Supreme Court properly applied the Raleigh v. Ohio decision. Now, we've heard some argument about Doyle, Doyle v. Ohio, Marks v. United States and United States v. Laub. I believe that those are nothing more than judicial glosses, at least two of them are. First of all, in the Marks decision, there was no citation at all to Raleigh. So we can't really say that that builds upon the Raleigh doctrine in any way. In Doyle, it was cited in a footnote, footnote 9, with a CF reference. So I don't know that that necessarily can be construed as a building upon the Raleigh doctrine. And similarly with Laub, there was reliance on Raleigh, where the Court said, ordinarily citizens may not be punished for actions undertaken in good-faith reliance upon authoritative assurance that punishment will not attach. But they're all emanations of the same core principle, aren't they? I think, Your Honor, they stem from a due process core. I don't know that they are – I don't know that Laub or Doyle can be considered necessarily echoes of that – of the Raleigh decision, I think. No, I didn't say echoes of Raleigh. I said emanations from the same core. Both having the – like Doyle having the concept, you don't tell somebody you don't have to talk and then you use that against them. That's kind of what Raleigh is talking about. That is what Raleigh is talking about. You don't tell somebody you don't have to talk and then use it against them. So they're really – they may not be building on each other exactly, but they're emanating from the same core principle, are they not? I guess my point, Your Honor, is I don't know that we can view the Washington Supreme Court's decision in light of Marks, in light of Doyle, and in light of Laub. First of all, Mr. Hutchinson – these cases were not relied upon in the district court, by the way. It was not in Mr. Hutchinson's habeas corpus briefing. Nor was it before the Washington Supreme Court. I believe in his original personal restraint petition in the Washington Supreme Court, Mr. Hutchinson cited to the Doyle case in a footnote on page 20, but from thereafter, Marks and Doyle were only in his reply brief in the Washington Court of Appeals. Nothing before the Washington Supreme Court, such as the motion for discretionary review or the supplemental brief that he filed in that court. So this case all along has been Raleigh, Raleigh, Raleigh all the time. It has not been a Marks or Doyle or other case. It's been premised upon Raleigh, and the allegation in the habeas corpus petition was that the Washington Supreme Court violated the Raleigh doctrine. So I think that those other decisions, although they might be interesting and they may amplify what the Supreme Court announced in Raleigh v. Ohio, they don't really add anything to Mr. Hutchinson's habeas corpus claim. And whatever might be the precise, clearly established contours of Raleigh v. Ohio, we don't believe that they were breached at all in Mr. Hutchinson's case. And if the Court has no further questions, we would ask that the Court affirm Judge Zelle's decision in all respects and deny habeas corpus relief. Thank you. Okay. Thank you. Case decided. We'll stand submitted. We'll next hear argument in.
judges: Kozinski, Fernandez, Clifton